COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Chief Judge Decker, Judges Malveaux and Friedman
Argued by videoconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
v.      Record No. 0599-21-2      JUDGE FRANK K. FRIEDMAN
NOVEMBER 30, 2021

TYEKH CHAMON DAVIS


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
D. Eugene Cheek, Sr., Judge

Lauren C. Campbell, Assistant Attorney General (Mark R. Herring,
Attorney General, on briefs), for appellant.

Kevin D. Purnell (Kevin D. Purnell, PLLC, on brief), for appellee.


On August 31, 2019, Tyekh Davis ("Davis") was subjected to a pat down by a Richmond

City police officer. A firearm was located on Davis' person, and he was charged with possession of

a firearm by a violent felon. Davis filed a motion to suppress the evidence, which was granted by

the circuit court of the City of Richmond. The Commonwealth appealed and asserts that the officer

had reasonable suspicion that Davis was armed and dangerous, and therefore that the circuit

court erred in granting the motion to suppress.

I. BACKGROUND

On August 31, 2019, around 10:00 p.m., Officer O'Rourke with the Richmond Police

Department was patrolling the Six Points area of the city of Richmond, a neighborhood known to

have high rates of violent crime and drug activity, when he observed a vehicle driving at a high

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

rate of speed make a turn without signaling. Officer O'Rourke and two other officers conducted a traffic stop on the vehicle.

The driver was asked to lower the rear driver's side window, where Officer O'Rourke was standing. The driver complied, and Officer O'Rourke saw that Davis was the rear driver's side passenger. Davis appeared to be very nervous. Officer O'Rourke reported that Davis was shaking and his heartbeat could be seen through his shirt and in his neck. Davis called his mother to tell her that the vehicle had been stopped by police. At this time, Officer O'Rourke did not see anything that looked like a gun on Davis' person.

Prior to this traffic stop, Officer O'Rourke was already familiar with Davis. He knew Davis to be a member of a criminal street gang whose members were known to carry firearms. He also knew that Davis had a prior conviction of malicious wounding stemming from a shooting that had occurred three years earlier, in 2016.

In a prior encounter with Davis on June 9, 2019, nearly three months before the traffic stop, Officer O'Rourke saw Davis with a bulge in his waistband that appeared to be in the shape of a firearm. Davis ran from Officer O'Rourke but was eventually detained. No firearm was found on his person or along the path that he had run. Later that same day, Davis posted a video to his Instagram account, stating that the police "would never catch him dirty" and depicting what appeared to be a firearm.

On the day of the traffic stop, August 31, 2019, Officer O'Rourke was familiar with Davis' Instagram account. He had seen the June 9 video, as well as other videos on social media of Davis handling firearms, including videos posted on July 9, 2019 and August 30, 2019. The video from August 30, the day before the traffic stop, showed Davis with a pistol and a semiautomatic rifle.

In the course of the traffic stop, the officers ran the information of all four occupants of the vehicle. After the information returned showing that none of the occupants were wanted by law enforcement, one of the other officers on scene asked the driver to exit the vehicle to speak with him alone. Officer O'Rourke and the other officer remained with the vehicle, with the three passengers still seated inside. At this point, no citation had been issued. Officer O'Rourke testified that the traffic stop was ongoing at this time.

After speaking with the officer, the driver consented to a search of the vehicle. When consent was obtained, the three passengers were asked to leave the vehicle. Two of them did; Davis did not. Officer O'Rourke asked Davis to get out of the vehicle three times. Officer O'Rourke did not tell Davis why he was being asked to exit the vehicle or that the driver had given consent to search. When Davis continued refusing to exit the vehicle, Officer O'Rourke took hold of Davis' wrist to "assist him out of the vehicle and detain him."

Once Davis was pulled out of the vehicle, Officer O'Rourke handcuffed him for "officer safety." Officer O'Rourke then conducted a pat down of Davis' person. Officer O'Rourke testified that he based this pat down on "what [he had] seen previously" with Davis, his past interactions with Davis, and Davis' extreme nervousness throughout the current encounter. In Davis' left pant leg, Officer O'Rourke felt what he believed to be a firearm. He removed the item from Davis' pants and found it to be a "Glock 27." Davis was ultimately arrested and charged with possession of a firearm by a violent felon, in violation of Code § 18.2-308.2.

Davis filed a motion to suppress the firearm, alleging that it had been obtained pursuant to an illegal search and seizure. Notably, Davis did not challenge the validity of either the traffic stop or the driver's consent to search the vehicle at the suppression hearing. In analyzing the motion to suppress, the trial court questioned why Officer O'Rourke did not tell Davis that he was going to pat him down before doing so and why Officer O'Rourke did not explain to Davis

- 3 -

why he needed to exit the vehicle or ask Davis why he refused to get out of the car. The trial court agreed that it is "reasonable for a police officer who has some indication that the person might be dangerous, to do a pat down," but the court was "concern[ed] about the communication between the police officer and" Davis. The trial court stated that the "issue is whether the police officer should have asked [Davis] more questions, in terms of letting him know what was going on." Ultimately, the trial court found that, had Officer O'Rourke communicated with Davis regarding why he was being asked to exit the vehicle, the pat down would have been valid, stating: "[i]f [Officer O'Rourke] had talked and communicated with him, this is all fine." Based on the lack of communication, the trial court deemed the search unreasonable. This appeal followed.

## II. STANDARD OF REVIEW

The appellant bears the burden of showing that the trial court committed reversible error in its ruling on a motion to suppress evidence based on an alleged Fourth Amendment violation. Malbrough v. Commonwealth, 275 Va. 163, 168 (2008). The facts must be viewed in the light most favorable to the prevailing party in the court below, and the appellate court is bound by the lower court's findings of fact "unless those findings are plainly wrong or unsupported by the evidence." Id. However, the trial court's application of the law to those facts is to be reviewed *de novo*. Id. at 168-69 (citing Ward v. Commonwealth, 273 Va. 211, 218 (2007)).

## III. ANALYSIS

"Under settled constitutional principles, once a law enforcement officer has conducted a valid traffic stop, the officer is justified in conducting a frisk of the person for weapons if the officer reasonably suspects that the person stopped is armed and dangerous." Commonwealth v. Smith, 281 Va. 582, 589 (2011) (citing Arizona v. Johnson, 555 U.S. 323, 327 (2009)). This

principle extends to both the driver and any passengers in a validly stopped vehicle. Id. at 594. Here, Davis did not contest the validity of the traffic stop.

When determining whether an officer has reasonable suspicion to support a pat down, courts must "look to the totality of the circumstances of each case." McArthur v. Commonwealth, 72 Va. App. 352, 359 (2020) (citing Whitfield v. Commonwealth, 265 Va. 358, 361 (2003)). Relevant factors include the "characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." McCain v. Commonwealth, 275 Va. 546, 554 (2008) (citing Terry v. Ohio, 392 U.S. 1, 28 (1968); Whitfield, 265 Va. at 362). "'[N]ervous, evasive behavior is a pertinent factor' for consideration in assessing the totality of the circumstances." Id. (quoting Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). When there are multiple individuals inside the stopped vehicle, "the officer's knowledge of the . . . occupants'[] prior criminal history is highly relevant in determining whether the officer had reasonable suspicion to conduct a pat down for his or her safety, particularly when that prior criminal history included weapons . . . ."[1] Smith, 281 Va. at 591.

Here, multiple factors supported Officer O'Rourke's reasonable suspicion that Davis was armed and dangerous, including the officer's personal knowledge of Davis' criminal history and social media posts. Officer O'Rourke's detailed knowledge of Davis' history and background included Davis' involvement in a past shooting and multiple social media posts from the prior three months showing Davis with guns – including one post showing Davis with a pistol and

---

[1] We have previously declined to impute one officer's knowledge about a driver's potential gang affiliation to a second officer who conducted a protective sweep of the driver's vehicle. McArthur, 72 Va. App. at 365-66. There are no such issues at play in the present case, as Officer O'Rourke possessed first-hand knowledge of Davis' history.

semiautomatic rifle from the *previous day*.[2]  In addition to this information, various other relevant factors were present:  the traffic stop was conducted at night in an area known for high rates of violent crime and narcotics use and distribution, and Davis was visibly nervous and shaking during the stop.  These factors, taken together with Officer O'Rourke's detailed knowledge of Davis' involvement with guns, gave the officer reasonable suspicion to believe Davis was armed and dangerous.

The trial court found that Officer O'Rourke's failure to communicate with Davis regarding the search of the vehicle made the pat down unconstitutional.  While we recognize the importance of communication between police officers and members of the public from both a public policy and safety perspective, the analysis in determining whether a pat down was lawful is defined by caselaw:  the critical inquiry is whether there is a lawful stop and reasonable suspicion that a person is armed and dangerous.  Id. at 589 (citing Johnson, 555 U.S. at 326-27).  An officer's failure to communicate does not invalidate an otherwise proper pat down performed in the context of a lawful stop, legitimate consent to search the vehicle, and reasonable suspicion that the individual to be frisked is armed and dangerous.[3]

---

[2] Knowledge of an individual's criminal history, standing alone, will not always suffice to establish reasonable suspicion.

> The remoteness of arrests and convictions or an absence of weapons-related or dangerous offenses in an individual's criminal history may be such that the individual's criminal history is not sufficient for an officer to reasonably be concerned about his safety or the safety of others in order to establish reasonable suspicion for a frisk.

Smith, 281 Va. at 593.  Here, the officer's knowledge of Davis' gun involvement was extensive.

[3] On appeal Davis suggests that the officers were attempting to prolong the traffic stop in order to search Davis outside the vehicle and that their misconduct should trigger the exclusionary rule.  While we are generally empowered to consider arguments made by a prevailing appellee in a "right for the wrong reason" context, we cannot do so when, as here, we would be required to make determinations on disputed factual issues that were not resolved by

For all these reasons, we hold that the circuit court erred in granting the motion to suppress, and the judgment of the circuit court is reversed and remanded.

<u>Reversed and remanded.</u>

---

the circuit court.  <u>Banks v. Commonwealth</u>, 280 Va. 612, 617 (2010); <u>Vandyke v. Commonwealth,</u> 71 Va. App. 723, 731-32 (2020).