Present:  Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and
Agee, JJ., and Russell, S.J.

RONALD WAYNE MALBROUGH, JR.                OPINION BY
                                   SENIOR JUSTICE CHARLES S. RUSSELL
v.  Record No. 062570                      January 11, 2008

COMMONWEALTH OF VIRGINIA

              FROM THE COURT OF APPEALS OF VIRGINIA

     In this appeal, we must determine whether, under the

facts presented, a defendant's Fourth Amendment protections

against unreasonable search and seizure were infringed by a

consent search of his person, conducted by police at a

roadside stop, after he had been told that he was free to

leave.

                       Facts and Proceedings

     The material facts are undisputed.  In the early

afternoon of February 25, 2004, Ronald Wayne Malbrough, Jr.,

was operating a light blue Cadillac in a residential area in

Chesterfield County.  He was stopped by Officer Stephen

Fortier of the Chesterfield County Police Department because

the Cadillac bore license plates registered to another vehicle

and because a rejection sticker was displayed on its

windshield.  There were two passengers in the car with

Malbrough, one in the front seat and one in the rear.  Officer

Fortier displayed his cruiser's flashing blue lights when

making the stop and they continued to flash throughout his

encounter with Malbrough.   Fortier parked his cruiser on the side of the road behind the Cadillac at the entrance to a subdivision.

Officer Fortier saw a handgun lying in plain view on the center console of the Cadillac as he walked up to the driver's window and at the same time Malbrough told him that he had a handgun in the car.  Officer Fortier told all the occupants of the car to keep their hands where he could see them and retrieved the handgun from Malbrough without incident. Fortier took the handgun back to his cruiser and announced on his police radio that he had recovered a weapon from the Cadillac.  Two other police vehicles, driven by Officers Neal Flatt and Richard Holmes, respectively, arrived at the scene almost simultaneously.  One parked on the side of the road behind Fortier's cruiser and the other parked on the side of the road ahead of the Cadillac but far enough ahead that "[t]here was plenty of room between the vehicles," such that Malbrough "would have been able to pull his vehicle out."  The flashing blue lights of Officers Fortier's and Flatt's police vehicles continued to operate throughout the encounter but Holmes believed it likely that those on his vehicle did not.

Officer Fortier returned to the Cadillac and asked Malbrough for his driver's license and registration.

2

Malbrough handed these to Fortier, who took them back to his cruiser to verify them.

While Fortier was thus engaged, Officer Holmes walked up to the Cadillac and spoke to Malbrough. At Holmes' request, Malbrough stepped out of the Cadillac. Holmes had responded to a complaint at an earlier date, reporting that shots had been fired at night, in another residential subdivision nearby, from a "Cadillac, a large, older model, which fit the description of the vehicle in question." Holmes told Malbrough about that incident, asked him if he knew anything about it, was satisfied with his answers, and concluded that he had no reason to detain him or question him further. This exchange lasted no more than three minutes.

While the foregoing conversation was going on, Officer Flatt, who was a firearms instructor, walked up to Officer Fortier's cruiser. Fortier handed Flatt the weapon Malbrough had handed him. Flatt "cleared" the weapon, a loaded .45 caliber semi-automatic pistol, and put it under his waistband in the small of his back. It remained there throughout the encounter and none of the participants made any further mention of it.

Meanwhile, Officer Fortier had determined that Malbrough's license and registration were "facially valid" and his computer check revealed no problems with them. He took

the documents back to the Cadillac, and, because Malbrough was still talking to Officer Holmes at the front of the vehicle, placed the driver's license and registration on the Cadillac's front seat.  Fortier asked both passengers to step out of the car and asked them to consent to a search.  They agreed.  He searched them and found no contraband.  He checked their names on his computer and found that they were not "wanted."  Fortier then "told Malbrough that his information was all on the driver's seat of his car and that he was free to leave."

After making that statement, Fortier asked Malbrough for permission to search the Cadillac.  Malbrough agreed.  Fortier's search revealed no weapons or drugs in the car, which was "fairly clean."  Fortier asked Malbrough "if he had anything illegal on his person."  Malbrough said no.  Fortier asked Malbrough for permission to search his person.  Malbrough "started pulling items from his pockets."  Fortier told him "not to put his hands in his pockets . . . I would do the checking."  Malbrough "told [Fortier] it was all right," turned away from Fortier, and "raised [his] hands in the air."  In Malbrough's right front trouser pocket, Fortier found plastic bags containing marijuana, "rock" cocaine, and powder cocaine.  Fortier arrested Malbrough.  The confrontation, from traffic stop to arrest, lasted about 13 minutes.

4

Malbrough was indicted by a grand jury for possession of cocaine with intent to distribute and for possession of a firearm while in possession of cocaine. He filed a motion to suppress the evidence obtained as a result of the search of his person, which the trial court denied. He subsequently entered conditional "Alford" pleas of guilty to the firearm charge and to the lesser charge of simple possession of cocaine, preserving his right to appeal the trial court's ruling denying his motion to suppress. The court imposed a sentence of three years confinement on the cocaine charge, all of which was suspended, and a sentence of two years confinement, to be served, on the firearm conviction.

Malbrough appealed his convictions to the Court of Appeals, which initially denied his appeal by a per curiam opinion. Malbrough requested review by a three-judge panel, which granted his petition, heard oral argument, and affirmed the convictions by a majority opinion, one judge dissenting. We awarded him an appeal.

## Analysis

Malbrough concedes that Officer Fortier's traffic stop was lawful and does not challenge any of the activities of the police that took place prior to the time he was asked to consent to a search of his person. At that time, he contends, he was unlawfully seized in violation of his Fourth Amendment

5

protections against unreasonable search and seizure, the warrantless search of his person was unlawful, and the results of the search, as the "fruit of the poisonous tree," should have been suppressed.

The applicable standard of review is well settled. The question whether the Fourth Amendment has been violated is always "a question of fact to be determined from all the circumstances." Ohio v. Robinette, 519 U.S. 33, 40 (1996) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973)). In reviewing the denial of a motion to suppress evidence claiming a violation of a person's Fourth Amendment rights, we consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial. The burden is on the defendant to show that the trial court committed reversible error. We are bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence. We will review the trial court's application of the law de novo. Ward v. Commonwealth, 273 Va. 211, 218, 639 S.E.2d 269, 272 (2007). Nevertheless, an appellate court "should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Reittinger v. Commonwealth,

260 Va. 232, 236, 532 S.E.2d 25, 27 (2000) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)).

Police officers are free to engage in consensual encounters with citizens, indeed, it is difficult to envision their ability to carry out their duties if that were not the case. See Parker v. Commonwealth, 255 Va. 96, 101-02, 496 S.E.2d 47, 50 (1998). In a series of decisions, however, the Supreme Court has limited lawful "consensual encounters" to circumstances in which "a reasonable person would feel free 'to disregard the police and go about his business.' " Reittinger, 260 Va. at 236, 532 S.E.2d at 27 (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)). The "reasonable person" test is objective, and presumes an innocent person rather than one laboring under a consciousness of guilt. Bostick, 501 U.S. at 437-38. The consensual encounter becomes a seizure "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Id. at 434.

Accordingly, the issue of fact presented to the trial court by Malbrough's motion to suppress was whether, when Officer Fortier asked him for permission to search his person, a reasonable person, under all the surrounding circumstances, would have believed that he was not free to leave, or rather, felt free to disregard the request and "go about his

7

business."  Id., see also United States v. Mendenhall, 446 U.S. 544, 554 (1980).

Malbrough argued before the trial court and on appeal that a reasonable person would not have felt free to leave the scene for a number of reasons.  At the time he was asked to consent to the search of his person, Malbrough was "in the midst of three armed police officers with his vehicle flanked in the front and back by two cruisers with flashing blue lights;" his pistol was being withheld by the police and there was no indication when, if ever, he could recover it; and his driver's license and registration cards had not been handed back to him but were on the front seat of his car.  He also made the argument that the offenses that led to his initial traffic stop were still ongoing:  The rejection sticker and improper plates were still displayed on his car, and even though he had not been given a summons for those offenses, he would be committing a further infraction if he drove away.

The Commonwealth responds that there was nothing unreasonable in the presence of three officers, in view of the presence of three occupants in the Cadillac having a loaded firearm in plain view; that the officers' cruisers were parked in such a way that they would not obstruct the Cadillac if Malbrough wished to leave; that the flashing blue lights were operating for safety reasons to warn approaching traffic of

8

vehicles stopped on the side of the road; that Malbrough gave the firearm voluntarily to Officer Fortier before the officer had even asked for it; that Malbrough never requested its return and that no further mention was ever made of it;[1] that Malbrough's driver's license and registration cards had indeed been returned to him when Fortier placed them on the front seat and told Malbrough they were there and that he was free to leave.

The Commonwealth also pointed out that, although Malbrough had been questioned about a shooting by Officer Holmes, Holmes was obviously satisfied with Malbrough's responses and made no objection when Fortier told Malbrough that he was free to leave. Finally, there was no evidence that any of the officers drew or brandished their weapons, touched the occupants of the Cadillac except with their consent, used hostile tones of voice, accused them of wrongdoing or made any intimidating gestures. Indeed, at the time Fortier made his request to search Malbrough, the police

---

[1] The Commonwealth acknowledges that Officer Flatt's retention of the weapon might have given Malbrough a claim against the police, but argues that it did nothing to make him think he was not free to leave. The Commonwealth argues that cases interpreting police retention of a defendant's personal property as a restriction of his freedom of movement focus on items necessary for travel, such as driver's licenses, car keys, passports, airline tickets, and the like. See, e.g., 4 Wayne R. LaFave, Search & Seizure § 9.4(a) n.81 (4th ed. 2004).

present at the scene had indicated to the occupants of the Cadillac that they had no reason to question or detain them further.  Compare McGee v. Commonwealth, 25 Va. App. 193, 200-01, 487 S.E.2d 259, 262-63 (1997) (reasonable person would conclude that he is not free to leave when police indicate he is suspected of criminal activity).

Malbrough relies on our decision in Reittinger, where we held a purported consent search following a roadside traffic stop to have been an unlawful seizure of the person because, in the circumstances of that case, a reasonable person would not in fact have felt free to go even after a police officer had told him he was free to do just that.  Reittinger, 260 Va. at 237, 532 S.E.2d at 28.  This case differs from Reittinger in several respects.  There, the defendant was stopped along a road in a rural area in the nighttime.  After deciding not to issue a summons for a defective headlight, a deputy sheriff told him he was free to leave.  Thereafter, while two other armed deputies flanked his car, one of them asked him to consent to a search.  When the defendant failed to give consent, the deputy repeated the request a second time and then a third.  The defendant never gave express consent to a search, but simply exited his vehicle, whereupon the deputy patted him down and found contraband.  Id. at 234-35, 532 S.E.2d at 26.  Here, by contrast, the search occurred in

10

daylight in a residential area.  The police on the scene were equal in number to the occupants of the Cadillac.  There was no evidence of any intimidating behavior on the part of the police.  Malbrough clearly gave his consent to the search, before it took place, in response to a single request by the officer.

The most significant distinction between Reittinger and the present case is that in Reittinger, the trial judge, who alone had the opportunity to look the witnesses in the eye and weigh their credibility, expressly found that the deputy effectively seized Reittinger without probable cause because a reasonable person in the circumstances would conclude that his detention continued and that he was not free to leave.  Id. at 236, 532 S.E.2d at 27.[2]  Here, the trial court, after analyzing all the attendant circumstances, made the opposite finding and concluded that a reasonable person would have felt free to ignore the request and leave the scene when Fortier asked Malbrough to consent to a search of his person.

There is good reason for the rule that appellate courts must defer to the factual findings of the trial judge in Fourth Amendment cases.  The fact patterns in such cases arrive in infinite variety, seldom or never exactly

11

duplicated.  Moreover, they involve consideration of nuances

such as tone of voice, facial expression, gestures and body

language seldom discernable from a printed record.  The

controlling inquiry is the effect of such matters on a

reasonable person in the light of all the surrounding

circumstances.

> The test is necessarily imprecise, because it
> is designed to assess the coercive effect of police
> conduct, taken as a whole, rather than to focus on
> particular details of that conduct in isolation.
> Moreover, what constitutes a restraint on liberty
> prompting a person to conclude that he is not free
> to 'leave' will vary, not only with the particular
> police conduct at issue, but also with the setting
> in which the conduct occurs.

Parker, 255 Va. at 102, 496 S.E.2d at 50 (quoting Michigan v.

Chesternut, 486 U.S. 567, 573 (1988)).  In the present case,

there was no evidence of any coercive conduct on the part of

the police after Malbrough was told that he was free to leave.

The Supreme Court perceptively held, by the language

quoted above from Ornelas, that the inferences drawn from the

evidence in such cases by trial judges, who have personally

heard and observed the witnesses, are entitled to deference.

We accord that deference to the trial court's finding here.

---

[2] Despite making that factual finding, the trial court
ruled that the subsequent "pat down" search was justified for
the deputies' protection.

12

We cannot say from the record that the trial court's finding was "plainly wrong or unsupported by the evidence." Ward, 273 Va. at 218. 639 S.E.2d at 272.  Malbrough did not carry his burden of showing that the trial court committed reversible error, and we find no error in the application of the law by that court or by the Court of Appeals. Accordingly, we will affirm the judgment of the Court of Appeals.

Affirmed.


JUSTICE KOONTZ, with whom CHIEF JUSTICE HASSELL joins, dissenting.

I respectfully dissent.  The material and undisputed facts surrounding the encounter of Ronald Wayne Malbrough, Jr. with the police on the afternoon of February 25, 2004 are amply recited in the majority opinion and need not be repeated in detail here.  Likewise, the principles of law applicable to the resolution of Malbrough's claim that the conduct of the police violated his Fourth Amendment rights as well as the principles governing our standard of review of that issue are well established and recited by the majority.  Under those facts and principles of law, the ultimate focus of the analysis of the issue presented is whether a reasonable person, under the particular factual circumstances of this

13

case, would have believed that he was free to disregard the request of the police to search his person and to leave the scene of the encounter. See Florida v. Bostick, 501 U.S. 429, 434 (1991); United States v. Mendenhall, 446 U.S. 544, 554 (1980); see also Reittinger v. Commonwealth, 260 Va. 232, 236, 532 S.E.2d 25, 27 (2000). In my view, no reasonable person could possibly believe himself free to leave the scene under the coercive circumstances of this police encounter.

In this case, Officer Stephen Fortier stopped the blue Cadillac car operated by Malbrough because the Cadillac bore license plates registered to another vehicle and because a rejection sticker was displayed on its windshield. This routine traffic stop quite appropriately evolved into a patent and serious concern for the safety of the officer when Officer Fortier approached the Cadillac and observed in plain view a loaded handgun on the center console. The officer retrieved the gun during Malbrough's acknowledgement that it belonged to him. Officer Fortier placed the gun in his police cruiser and called for "backup" on his police radio. Responding to that call, Officers Neal Flatt and Richard Holmes arrived immediately at the scene in separate police cruisers. Thereafter, the police searched the two passengers in the Cadillac as well as the vehicle. While these searches were being conducted, Officer Holmes asked Malbrough to step out of

14

the Cadillac.  Malbrough complied and the two men moved to a location between the front of the Cadillac and the rear of Officer Holmes' police cruiser.  There, Officer Holmes questioned Malbrough regarding an incident that had previously occurred several miles away in which shots reportedly had been fired from a Cadillac generally fitting the description of Malbrough's Cadillac.

Officer Holmes concluded that he did not have a basis to charge Malbrough for the earlier shooting.  Nothing in the record, however, suggests that Officer Holmes informed Malbrough that he was no longer under suspicion for the earlier crime; nor did Officer Holmes advise Malbrough that he was free to go.  Rather, as the questioning by Officer Holmes was concluding, Officer Fortier approached and advised Malbrough that his driver's license and registration were on the driver's seat of the Cadillac and that Malbrough was "free to leave."  Nevertheless, Officer Fortier immediately asked Malbrough for consent to search his person for drugs or weapons.  At that time, Malbrough's handgun was in Officer Flatt's waistband.  The officers did not tell Malbrough how or when the gun would be returned to him if he decided to leave the scene without consenting to the search of his person by Officer Fortier.

The majority correctly notes that the test for determining whether a reasonable person under all of the circumstances would have believed that he was not free to leave the scene of a police encounter is "necessarily imprecise, because it is designed to assess the coercive effect of police conduct." Michigan v. Chesternut, 486 U.S. 567, 573 (1988). For this reason, isolated conduct of the police, such as a statement that "you are free to leave," must be considered in view of all the surrounding circumstances.

The circumstances of this case are more compelling in that regard than those upon which our decision in Reittinger were premised. In Reittinger, we held that a reasonable person would not have believed that he was free to leave even after the police had advised the driver of a stopped vehicle that he was free to go. Here, two police officers in separate police cruisers responded to the scene of the traffic stop because Officer Fortier had radioed for backup after he had taken possession of Malbrough's handgun. Malbrough was made aware by Officer Holmes that the focus of his questions was a recent and nearby incident involving a shooting from a Cadillac matching the description of Malbrough's Cadillac in several aspects. Beyond question, a reasonable person under these circumstances would have concluded that the police were then concerned with resolving the rational suspicion that

16

Malbrough and his vehicle were implicated in the shooting incident rather than a concern with the traffic violations that prompted the stop by Officer Fortier. While Officer Holmes may have concluded that he had no basis to detain Malbrough further relating to the shooting incident, he did not convey that subjective conclusion to Malbrough. The police had conducted searches of the passengers in the Cadillac as well as the vehicle because they had discovered the presence of Malbrough's gun; only Malbrough remained unsearched. The police retained possession of Malbrough's gun and had not indicated how or when the gun might be returned to him. At that point in the encounter, despite Officer Fortier's statement that he was free to leave, a reasonable person would not have believed that Malbrough was free to leave until there was some objective indication from Officer Holmes that such was the case as a result of his subjective conclusion that Malbrough was not going to be detained in connection with the shooting incident that Officer Holmes was investigating.

There is no question that the police in this case had the right to temporarily seize Malbrough's handgun for their safety until their investigation at the scene of the traffic stop was completed. However, under the particular circumstances of this case, I would hold that Malbrough was

17

unlawfully seized in violation of his Fourth Amendment rights and, therefore, that the Court of Appeals erred in affirming the trial court's judgment in refusing to suppress the product of that unlawful seizure.

Accordingly, I would reverse the judgment of the Court of Appeals, vacate Malbrough's conviction, and remand the case to the Court of Appeals with direction that the case be remanded to the trial court for a new trial if the Commonwealth were so advised.